UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RONALD W. BURKLE,

            Plaintiff,

    v.

OTK ASSOCIATES, LLC, a Delaware Limited Liability Company, JASON T. KALISMAN, MICHAEL E. OLSHAN, ANDREA L. OLSHAN, MAHMOOD KHIMJI, JONATHAN LANGER, PARANG VORA and JOHN T. DOUGHERTY,

            Defendants.

---

Civil Action No.

13CIV4557
(LLS)
ECF CASE

COMPLAINT

RECEIVED JUL - 1 2013 U.S.D.C. S.D.N.Y. CASHIERS

# OVERVIEW

1. In this action, a shareholder of Morgans Hotel Group Co. ("**Morgans**" or the "**Company**") seeks relief from a shareholder vote that was tainted by violations of Securities Exchange Act section 14(a) and Securities and Exchange Commission Rule 14a-9. Defendants (OTK Associates, LLC and its seven nominees for the Morgans Board of Directors) have seized control of Morgans by using false and materially misleading proxy solicitation materials to obtain proxies to vote Morgans' incumbent Board of Directors (the "**Board**") out of office and replace it with the seven individual Defendants. In particular, Defendants' proxy solicitation materially misrepresented the conclusions of the world's two most influential proxy advisory firms concerning this contested election. Each of the advisory firms had unequivocally concluded that Morgans would best be served by retaining a four-director majority of the Company-nominated directors on the Board, and electing a minority of three of the Defendants to the Board. Defendants' proxy solicitation materials materially misrepresented the proxy advisory firms' conclusions, describing them as if the proxy advisory firms had concluded that shareholders should vote the entire incumbent Board out of office and deliver control to the Defendants.

2. Morgans operates (and in some instances owns) luxury hotels under brands such as Hudson, Delano and Mondrian, and (through a 90%-owned subsidiary) develops, redevelops and operates food and beverage operations at various venues including Las Vegas resorts.

3. Defendants—OTK Associates, LLC ("**OTK**") and various individuals affiliated with OTK—sought to seize control of Morgans at the 2013 annual meeting of Morgans shareholders. They did so by soliciting proxies for the election of the seven individual Defendants to the Morgans' seven-member board of directors, and by opposing the election of

six incumbents whose re-election the incumbent Board and the Company supported. (A seventh incumbent director, Defendant Jason Taubman Kalisman, refused to permit his name to appear on the Company's and the incumbent Board's slate – instead placing his name on the slate proposed by the Defendants.)

4. OTK owned 13.9% of the voting shares of Morgans. None of the other Defendants owned any Morgans shares (but each of the other Defendants is affiliated with OTK). No single Morgans shareholder or group of shareholders controlled a majority, or even a large plurality, of the shares eligible to vote at the 2013 Morgans Annual Meeting to be held June 14, 2013 (the "**2013 Annual Meeting**"). To achieve their objective of taking control of Morgans, Defendants had to solicit proxies from the many institutional and individual investors among whom Morgans shares (and therefore votes) were dispersed.

5. An important component of Defendants' proxy solicitation campaign was a press release, broadcast via Business Wire and filed with the Securities and Exchange Commission on June 5, 2013. There, Defendants misrepresented the recommendations of the leading proxy advisory firms Institutional Shareholder Services Inc. ("ISS") and Glass Lewis & Co., LLC ("Glass Lewis"). ISS and Glass Lewis, to whose opinions institutional investors and others give great weight in proxy contests, had each concluded that Morgans would best be served by retaining a majority (four directors) from the slate of incumbent directors that Defendants opposed, and electing three directors from Defendants' slate. Defendants' proxy solicitation misleadingly described the ISS and Glass Lewis conclusions as if they had concluded that the entire Board (other than Kalisman) should be turned out of office and the Defendants should gain control of Morgans.

6.  As a result of their misleading proxy solicitation, Defendants obtained enough proxies to elect all seven individual Defendants to the Board, and to turn out of office all six directors the Defendants had opposed. At the 2013 Annual Meeting, Defendants voted those proxies, and have since seized control of the Board. Without an injunction from this Court, Morgans will be controlled by elected directors who were elected by means of an improper proxy solicitation. In addition, Plaintiff will be deprived of his right to participate in a shareholder vote untainted by false and misleading proxy solicitations.

## JURISDICTION AND VENUE

7.  The claims asserted in this action arise under §14(a) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 14a-9 promulgated thereunder. Jurisdiction is conferred by §27 of the 1934 Act. Venue is proper pursuant to §27 of the 1934 Act. Acts constituting the violations complained of occurred in this District.

## THE PARTIES

8.  Plaintiff Ronald W. Burkle is, and at all times relevant to this action was, the owner of 22,367 shares of common stock of defendant Morgans, which shares were entitled to vote at the 2013 Annual Meeting. Until the 2013 Annual Meeting, Burkle was a member of the Board. Investment funds affiliated with The Yucaipa Companies, a private investment firm of which Burkle is managing partner, held preferred securities, convertible notes and warrants issued by Morgans, but none of those securities was entitled to vote at the 2013 annual meeting. Yucaipa acquired its preferred securities and warrants in consideration of Yucaipa providing Morgans with $72 million to rescue the Company during the 2009 financial crisis. Between

Burkle's direct interest as a common stockholder, and the Yucaipa entities' interests as holders of preferred securities, convertible notes and warrants, Burkle and the Yucaipa entities have the greatest economic interests of any investor in Morgans achieving prosperity (and the greatest amount at risk should Morgans fail).[1]

9. Defendant OTK is a Delaware limited liability company. At all times relevant to this action, OTK was the owner of 4,500,000 shares of Morgans common stock. OTK's shares represented approximately 13.9% of the issued and outstanding shares of Morgans common stock. Plaintiff alleges, on information and belief, (based upon statements made by OTK in its filings with the Securities and Exchange Commission) that OTK is an investment vehicle of the Olshan, Taubman and Kalisman families.

10. Defendant Jason Taubman Kalisman is a co-founding member of OTK and is, and at all times relevant to this action was, a director of Morgans and a member of the slate of director candidates nominated in Defendants' proxy solicitation.

11. Defendant Michael E. Olshan is one of the two managers of OTK and a member of the slate of director candidates nominated in Defendants' proxy solicitation.

12. Defendant Andrea L. Olshan is a member of the slate of director candidates nominated in Defendants' proxy solicitation.

13. Defendant Mahmood Khimji is a member of the slate of director candidates nominated in Defendants' proxy solicitation.

---

[1] The rights Burkle seeks to address with this action are his rights as a shareholder to an election untainted by Defendants' violations of Federal law concerning proxy solicitations. In addition, the Yucaipa entities have instituted litigation in New York Supreme Court to remedy breaches of contracts the Defendants have caused Morgans to commit since they took Board control.

- 4 -

14. Defendant Jonathan Langer is a member of the slate of director candidates nominated in Defendants' proxy solicitation.

15. Defendant Parag Vora is a member of the slate of director candidates nominated in Defendants' proxy solicitation.

16. Defendant John Dougherty is a member of the slate of director candidates nominated in Defendants' proxy solicitation.

17. Plaintiff is informed and believes that each of the individual Defendants is a participant in the proxy solicitation alleged herein. That information and belief is based upon the appearance of each individual Defendant's name above the legend "(Name of Person(s) Filing Proxy Statement, if Other Than the Registrant)" on the Schedule 14A filed with the Securities and Exchange Commission that contained the proxy solicitation materials on which this action is based.

## OTK'S EFFORT TO SEIZE CONTROL OF MORGANS

18. From 2011, through the spring of 2013, OTK was represented on the Board by one director, defendant Kalisman. In mid-March 2013, OTK announced its intention to solicit proxies in support of an effort to occur at the 2013 Annual Meeting to elect a slate consisting of the seven individual Defendants to the Board, replacing all the incumbent directors except Kalisman.

19. The Company nominated for re-election six incumbent directors, none of whom was on Defendants' slate of candidates. Kalisman refused to permit the Company to include him as a seventh member of the slate of candidates, and instead authorized his name to be included in Defendants' slate.

20. On various dates in April, May and early June 2013, Defendants, on the one hand, and the Company, on the other, published various materials in support of their respective proxy solicitations, and filed those materials with the Securities and Exchange Commission. Topics debated in those proxy solicitations included the qualifications of the respective slates of candidates for the Board; the plans (or lack thereof) of Defendants' slate for returning Morgans (which had suffered financial reverses during and after the recent financial crisis and recession) to prosperity; the advantages and disadvantages of a plan adopted by the Board to raise equity and retire debt, including debt and preferred securities held by entities affiliated with Plaintiff (the "Recapitalization"); and the contentions of the parties in litigation that OTK and Kalisman had instituted in Delaware Chancery Court to enjoin the Recapitalization.

21. Neither the Defendants, nor the incumbent Board and Company management, controlled enough shares to determine the outcome of the proxy contest. OTK had the largest voting bloc with 13.9%. Morgans' incumbent directors and officers owned, in the aggregate, only 3.8%. The contest thus turned on the success of each side in soliciting proxies from institutional and individual investors who had no affiliation with either side. The success of those efforts would turn, in substantial part, on what a significant percentage of those unaffiliated investors thought was recommended by the major third-party proxy advisory firms, described below.

## ISS AND GLASS LEWIS' RECOMMENDATIONS

22. Proxy advisory firms wield enormous influence in proxy contests. Their influence arose as a result of various regulatory and market developments in recent decades, including: guidance from the Department of Labor concerning the fiduciary duties of pension fund managers to vote shares owned by pension plans; the adoption by the Securities and

Exchange Commission of rules requiring registered investment advisers to adopt policies and procedures designed to ensure that proxies are voted in the best interests of their clients; a general rise in shareholder activism; and the increased proportion of the stock market that is in the hands of investment advisors and other fiduciaries. ISS has been described by the United States Government Accountability Office as the "dominant" proxy advisory firm. Glass Lewis is the second most influential proxy advisory firm. In the words of the Chancellor of the Delaware Chancery Court:

> "[P]owerful CEOs come on bended knee to Rockville, Maryland, where ISS resides, to persuade the managers of ISS of the merits of their views about issues like proposed mergers, executive compensation, and poison pills. They do so because the CEOs recognize that some institutional investors will simply follow ISS's advice rather than do any thinking of their own. ISS has been so successful that it now has a California rival, Glass Lewis."

23. Investors do not rely on proxy advisors merely out of laziness. Several reasons explain why the proxy advisors have become influential. First, the sheer number of different companies whose shares are owned by an institutional investor may make it impractical for even the biggest investor to do its own analysis of every vote; yet many institutional investors are expected by their regulators to vote as a matter of fiduciary responsibility. The enormous institutional investor TIAA-CREF has explained:

> "Though we dedicate a significant amount of resources to corporate governance research and the voting of proxies, we would still have difficulty processing the 80,000 plus unique agenda items voted by our staff annually without utilizing [proxy advisor] research."

24. Second, voting in accordance with the conclusions of the major proxy advisors makes it less likely that a money manager or other fiduciary at an institutional investor might be

challenged by a regulator or unhappy client for voting the shares unreasonably. Third, especially for smaller institutions or individual investors, a major proxy advisor's endorsement of one or another of the competing proxy contestants' positions may be taken as a stamp of approval from an independent source of expertise. For these and other reasons, what ISS and Glass Lewis have concluded concerning a contested proposition—particularly a proposition as fundamental as whether or not the majority of a board of directors should be replaced—is a material fact.

25. OTK and the incumbent Board each sought to persuade ISS and Glass Lewis to endorse their respective positions. Rather than endorse one slate over the other, both proxy advisory firms rendered a Solomonic judgment, recommending that the Company slate retain a majority of the board seats with OTK nominees taking a minority position. ISS and Glass Lewis each concluded that Morgans shareholders would best be served by a Board consisting of four of the Company's nominees, and three of OTK's.[2]

26. ISS reported that it did "not believe the [sic] OTK has presented a case for sweeping majority change, particularly as it relates to supplying a detailed transition plan that describes how the new board would mitigate the potential unintended consequences associated with a majority change to the board including the specific identification of a new management team." Instead, ISS concluded that OTK had "made a compelling case for substantive minority change on the board, and [had] nominated several qualified candidates who are likely to be additive to Morgans board." Accordingly, ISS recommended electing only three directors from the OTK slate.

---

[2] ISS and Glass Lewis each recommended the election of two OTK nominees, Kalisman and Khimji. They differed as to who the third should be, with ISS recommending Langer and Glass Lewis recommending Dougherty.

27. Similarly, Glass Lewis concluded that the Defendants had failed to make the case for replacing a majority of the Board and stated: "In our opinion, a board consisting of four of the Company's nominees and three of [OTK's] nominees would restore balance to the board and improve the likelihood that the board would act in the best interests of all shareholders as it seeks to enhance the Company's performance." Based on that conclusion, Glass Lewis recommended that shareholders support three of OTK's nominees.

28. ISS and Glass Lewis issued their recommendations on June 4, 2013, and copies were provided to OTK and Morgans. ISS and Glass Lewis did not, however, publish their reports to the investing public at large. Except for those shareholders who happened to be paying customers of ISS and Glass Lewis, Morgans shareholders had to rely on the accuracy of the descriptions of ISS' and Glass Lewis' recommendations in proxy solicitation materials.

29. OTK published a purported description of the ISS and Glass Lewis recommendations on June 5, 2013, via a press release on Business Wire. That same day, OTK and the other Defendants caused that press release to be filed with the Securities and Exchange Commission as additional proxy solicitation materials on their behalf (the "**Solicitation**"). But instead of accurately reporting what ISS and Glass Lewis recommended, Defendants' Solicitation weaved misleadingly incomplete quotations from the ISS and Glass Lewis reports with misleading paraphrases of those reports to create the materially misleading impression that ISS and Glass Lewis had recommended turning out of office the majority of the Morgans Board and delivering control of the Company to the OTK slate. Defendants' materially misleading statements are set forth in detail below.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN DEFENDANTS' PROXY SOLICITATION

30. The materially false and misleading statements in Defendants' Solicitation began with its headline: "**LEADING PROXY ADVISORY FIRMS ISS AND GLASS LEWIS BOTH REJECT ENTIRETY OF MORGANS HOTEL GROUP'S NOMINEES AND DEFINITIVELY RECOMMEND VOTE FOR CHANGE ON OTK'S GOLD CARD.**" [Bold/capitalization in original] The headline was materially false and misleading because it (and the entire Solicitation) omitted to disclose: (1) ISS' conclusion that OTK had failed to make "a case for sweeping majority change" and that only the "additive" election of two of Defendants' candidates plus Kalisman to the existing Board majority was appropriate; and (2) Glass Lewis' conclusion that "a board consisting of four of the Company's nominees and three of [OTK's] nominees" would be best.

31. Materially false and misleading statements and omissions abound in the body of the Solicitation. The Solicitation quoted in full the first two paragraphs of ISS' three-paragraph section headed "ISS CONCLUSION—IS CHANGE NEEDED?" But without ellipses or any other indication that something has been left out, the solicitation omits the crucial third paragraph, in which ISS concluded that it did

> "Not believe the OTK has presented a case for sweeping majority change, particularly as it relates to supplying a detailed transition plan that describes how the new board would mitigate the potential unintended consequences associated with a majority change to the board. . . ."

32. The Solicitation contained a similarly misleading description of Glass Lewis' conclusions:[3]

| Misleading Quotes in the Solicitation | Glass Lewis' Actual Conclusions |
|---|---|
| "In this case, we believe the Dissident has identified areas of concern, both operationally and governance related, that have resulted in the destruction of shareholder value and, at times, the disregard of shareholder interests. We are concerned that the current control and stewardship of the Company largely resides with one investment firm, Yucaipa, and arguably one individual, Mr. Burkle. | "In this case, we believe the Dissident has identified areas of concern, both operationally and governance related, that have resulted in the destruction of shareholder value and, at times, the disregard of shareholder interests. We are concerned that the current control and stewardship of the Company largely reside with one investment firm, Yucaipa, and arguably one individual, Mr. Burkle. ***However, we aren't convinced that turning complete control of the board over to the Dissident's full slate of nominees, another group of inter-connected individuals who may also be conflicted, would likely result in a superior outcome for Morgans shareholders at this time.*** Yet, some board changes appear to be necessary. |
| \* \* \* \* | \* \* \* \* |
| "Thus, in our view, it doesn't appear that maintaining the status quo on the board is likely to result in a substantially different outcome for shareholders. Though some developments give us cause to be optimistic, we believe the board could be improved with the addition of new directors who possess [sic] relevant industry experience and aren't beholden to the influence of Mr. Burkle or Yucaipa." | "Thus, in our view, it doesn't appear that maintaining the status quo on the board is likely to result in a substantially different outcome for shareholders. Though some developments give us cause to be optimistic, we believe the board could be improved with the addition of new directors who possess [sic] relevant industry experience and aren't beholden to the influence of Mr. Burkle or Yucaipa. We also believe that Mr. Kalisman should maintain his role as OTK's current representative on the board. In our opinion, Messrs. Dougherty and Khimji are the two strongest nominees on the Dissident slate, based on their significant hotel management and real estate experience and their ancillary ties to either the Olshan or Taubman families, as opposed to the more direct ties of actual family members. |
|  | "Ordinarily, we might believe that the optimal board structure for the Company would consist of two Yucaipa nominees, one OTK nominee and four truly independent directors. But in this case, due to the influence of Mr. Burkle and Yucaipa, as well as the Company's past performance and governance practices, as well as the apparent lack of relevant industry experience at the Company, ***we believe a more balanced board structure consisting of the largest debt holder's nominees and*** |

---

[3] Italicized bold-face indicates emphasis added. Other emphases are in original.

OTK is urging stockholders to vote "**FOR**" OTK's proposed slate of independent director nominees on the **GOLD** proxy card today.

> *the largest shareholder's nominees is more appropriate. In our opinion, a board consisting of four of the Company's nominees and three of the Dissident's nominees could restore balance to the board and improve the likelihood that the board would act in the best interests of all shareholders as it seeks to enhance the Company's performance.* Based on these factors, we believe shareholders should support the election of three Dissident nominees to the board.
>
> "Accordingly, we recommend that shareholders use the **GOLD** proxy card to vote:
>
> "**FOR** Dissident nominees: DOUGHERTY, TAUBMAN AND KHIMJI;
>
> "**WITHHOLD** from Dissident nominees: LANGER, ANDREA OLSHAN, MICHAEL OLSHAN AND VORA."

33. The effect of Defendants' materially false and misleading statements and omissions was to leave a reasonable reader with the false impression that ISS and Glass Lewis had concluded that the incumbent Board should be turned out of office, and that control should be delivered to the Defendants, rather than (what ISS and Glass Lewis actually concluded) that the incumbent majority should remain on the Board, with OTK's minority representation increased from one to three.

34. This was not a simple situation of a party cherry-picking its quotations from a widely-available document. ISS and Glass Lewis do not publish their reports to the shareholders as a whole, or file them with the Securities and Exchange Commission or on some other generally available source of information. They provide their reports only to their subscribers and to the contestants to a proxy contest, who are not permitted to redistribute the reports themselves. There was thus no readily available source a typical shareholder could consult to fact-check the Solicitation.

35. Defendants compounded the misleading effect of the Solicitation by falsely branding as a lie a statement from Morgans that accurately reported the conclusions of ISS and Glass Lewis. On June 5, 2013, Morgans had issued a press release stating that it was disappointed that ISS and Glass Lewis had each recommended the election of three OTK nominees to the Board, but that it was pleased that ISS and Glass Lewis "rejected OTK's attempt to take control of the Morgans Board." This was a truthful description of what ISS and Glass Lewis had concluded. Nevertheless, Defendants' Solicitation represented that this description represented "management's attempt today to *mislead its own investors on the facts* by trying to positively spin what was a *total loss*. . . . Our *seven nominees* will immediately provide the board with the essential [experience and ability] necessary to address Morgans' bloated overhead and capital needs. . . ." (Emphasis added.)

36. Defendants were at least negligent in their publication of the false and misleading Solicitation.

## THE ELECTION OF OTK'S ENTIRE SLATE OF DIRECTORS IN A TAINTED VOTE

37. Defendants' Solicitation had its intended effect. Defendants obtained proxies for all seven of the individual Defendants in sufficient numbers to elect them all at the 2013 Annual Meeting, turning out the incumbent majority of the Board and handing control over the Company to OTK.

## COUNT ONE

### (For Violation Of § 14(a) Of The 1934 Act And Rule 14a-9 Thereunder)

38. Plaintiff avers and incorporates by reference the allegations of Paragraphs 1 through 37 above.

39. Defendants, and each of them, solicited proxies by means of proxy statements and other communications containing statements which, at the time and in the light of the circumstances under which they were made, were false or misleading with respect to material facts, and which omitted to state material facts necessary to make the statements made not false or misleading.

40. Defendants, by the use of means or instrumentalities of interstate commerce and otherwise, solicited proxies in contravention of Securities Exchange Commission rule 14a-9 with respect to securities subject to that Rule.

41. Disclosure of the facts concerning the recommendations of ISS and Glass Lewis that were omitted from, or misrepresented in, Defendants' proxy solicitation materials would have been viewed by a reasonable shareholder as having significantly altered the total mix of information made available to shareholders.

42. Plaintiff suffered injury as a result of Defendants' aforementioned material misrepresentations. The proxy solicitation was an essential link in the accomplishment of the election resulting in the OTK's takeover of the Board.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. A declaration that the proxy solicitation materials distributed by the Defendants to shareholders were materially false and misleading, in violation of Rule 14a-9 and §14(a).

B. An injunction requiring Defendants to cause Morgans to call a meeting of shareholders and hold a new election of its Board of Directors as soon as practicable.

C. An award of further extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, and any appropriate state law remedies.

D. Awarding such other and further relief as the Court may deem just and proper.

DATED: New York, New York
July 1, 2013

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
A Professional Corporation

By: _____
Leo V. Leyva
Attorneys for Plaintiffs
900 Third Avenue, 16th Floor
New York, NY 10022-4728
(212) 752-8000

-and-

Randall G. Sommer
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Los Angeles, CA 90071
(213) 683-9142